IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

SHIRLEY SOURYAL,                    )
    Plaintiff,                      )
                      )
v.                                  )    Case No. 1:11cv643
                      )
TORRES ADVANCED ENTERPRISE          )
SOLUTIONS, LLC.,                    )
    Defendant.                      )

## MEMORANDUM OPINION

Plaintiff alleges that her former employer violated the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA") by refusing to return plaintiff to her former position at the U.S. Embassy in Baghdad, Iraq, and then by terminating her, after she had taken medical leave. At issue on a motion to dismiss for failure to state a claim is whether the FMLA affords rights to an employee where, as here, the employee's worksite is outside the territory of the United States. Because the Embassy in Baghdad is not a U.S. territory, and because Congress, in light of the presumption against the extraterritorial effect of statutes, cannot be assumed to have intended the rights afforded by the FMLA to have extraterritorial application, plaintiff, whose worksite was outside U.S. territory, is not entitled to any rights under the FMLA. Thus, plaintiff's FMLA claim must be dismissed.

I.

Plaintiff Shirley Souryal ("Souryal") is a resident of Virginia and a former employee of defendant Torres Advanced Enterprise Solutions, LLC. ("Torres"), a consulting firm

headquartered in Falls Church, Virginia.[1]  During Souryal's employment at Torres, Torres

contracted with the U.S. Department of State (the "State Department") to provide administrative

support and other services at various locations, including the U.S. Embassy in Baghdad, Iraq (the

"Embassy").  Souryal began working at Torres in August 2007 as an Organizational

Development Specialist assigned to the Embassy.  During her work assignment at the Embassy,

Souryal became ill.  On May 4, 2009, she sought medical attention at the Embassy Medical Unit

and was diagnosed with bronchitis.  She visited the Embassy Medical Unit again several days

later, and the treating physician prescribed antibiotics and steroids.  Her condition continued to

deteriorate as she suffered from "labored breathing, fever, inability to swallow, severe fatigue

and sleep deprivation."  Amend. Compl. ¶ 26.  On May 14, 2009, Souryal was taken to a nearby

military hospital and then, after the hospital denied her admission, to a small medical clinic in

Baghdad.  A physician at this clinic assessed Souryal's condition and directed Souryal (i) to

remain quarantined in her quarters in the Embassy compound and (ii) to return regularly to the

clinic for treatments, which included IV injections of fluids and antibiotics.

　　　Over the next few weeks, Souryal performed some work remotely from her quarters in

the Embassy compound.  During this time, various Torres and State Department employees,

including her immediate supervisor, State Department employee April Powell-Willingham, and

Torres Deputy Program Manager Joyce Gammelco, received regular updates on Souryal's

medical condition.  On June 2, 2009, Dwight Samuels, General Services Officer for the State

Department, recommended to Souryal that she seek medical evacuation from Baghdad on

account of her illness.  Powell-Willingham concurred in Samuel's recommendation.  Later that

---

[1] The facts recited here are taken from the allegations in the First Amended Complaint, which are
treated as true solely for the purpose of deciding the instant dismissal motion. *See Ashcroft v.
Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009).

day, Gammelco told Souryal that Torres had been informed of Souryal's situation, but that Souryal was responsible for making her own arrangements to leave Iraq and should not expect assistance from Torres. Souryal departed Baghdad the following day and received additional medical treatment in Cairo, Egypt. Torres stopped paying Souryal on June 4th, the date she departed Baghdad.

On June 15, 2009, Powell-Willingham asked Souryal when Souryal could report for work. Souryal responded that she was eager to do so, but that she could not estimate when her medical issues would be resolved. On June 24, 2009, Karie Newmyer, Torres' Human Resources Director, told Souryal that "her services were no longer needed at the Embassy." Amend. Compl. ¶ 66. After Souryal's treating physician in Egypt discharged her from his care on June 28, 2009, Souryal told Newmyer that she wanted to continue working at the Embassy. Newmyer responded that there was no available position for Souryal and suggested that Souryal return to the United States, which Souryal did on July 12, 2009. From this time until August 2010, Souryal made repeated requests to Newmyer and other Torres personnel that she be restored to her former position or given a comparable position. Torres answered none of these requests.

Souryal filed her original complaint against Torres on June 15, 2011 alleging that Torres had violated the FMLA by not holding her employment position open, and later terminating her, after she had taken medical leave. Specifically, Souryal alleged that the FMLA entitled her to take medical leave, and that Torres' failure to restore her to her prior position and eventual decision to terminate her violated the FMLA. The complaint also alleged that Torres had failed to provide her with written notice of her right to continuation medical coverage upon termination

of her medical benefits in violation of the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA").

Torres moved to dismiss both claims in the original complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P. Following oral argument on the motion, an Order issued granting Souryal leave to file an amended complaint with respect to both the FMLA and ERISA claims. *Souryal v. Torres Advanced Enter. Solutions*, No. 1:11cv643 (E.D. Va. Oct. 28, 2011) ("October 28 Order"). On November 9, 2011, Souryal complied by filing her First Amended Complaint, which Torres again moved to dismiss for failure to state a claim. The October 28 Order also granted the parties leave to submit "supplemental legal memoranda addressing, *inter alia*, whether the U.S. Embassy in Baghdad is a 'possession of the United States' pursuant to 29 C.F.R. § 825.105(b)." *Id.* Souryal and Torres complied by submitting supplemental memoranda. By Order dated December 20, 2011, Souryal's FMLA claim was dismissed with prejudice "because the FMLA does not apply extraterritorially, irrespective of whether the U.S. Embassy in Baghdad is a possession of the United States." *Souryal v. Torres Advanced Enter. Solutions*, No. 1:11cv643 (E.D. Va. Dec. 20, 2011) ("December 20 Order"). This Memorandum Opinion elucidates the reasons for that conclusion.

The December 20 Order dismissed Souryal's ERISA claim but granted her leave amend her complaint yet again with respect to this claim. On January 4, 2012, Souryal filed her Second Amended Complaint, which alleged additional facts pertinent to the ERISA claim. Torres' motion to dismiss the Second Amended Complaint for failure to state a claim was denied by Order dated January 31, 2012. *Souryal v. Torres Advanced Enter. Solutions*, No. 1:11cv643 (E.D. Va. Jan. 31, 2012).

## II.

Dismissal pursuant to Rule 12(b)(6), Fed. R. Civ. P., is appropriate where the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 129 S. Ct. at 1949.  And, in this respect, it is also true that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to *legal* conclusions." *Id.* (emphasis added). *Accord Eastern Shore Markets v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).  Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949.  Instead, the complaint must allege facts that, if true, plausibly satisfy each element of the claims for which relief is sought. *Id.* at 1950.

## III.

Torres argues that Souryal's FMLA claim must be dismissed because she was working outside the territory of the United States and the FMLA has no extraterritorial effect.  Whether the FMLA has extraterritorial effect is an important, and as yet unresolved, question[2] that need not be reached here unless it is first determined that the facts alleged in the complaint indeed

---

[2] As commentators have observed, there is no federal-court published decision that has expressly decided this question. *See, e.g.*, Aaron J. Schindel, *Extraterritorial Application of U.S. Labor and Employment Laws*, 13 Int'l L. Practicum 47, 47 (2000); Carson Sprott, Note, *Competitive and Fair: The Case for Exporting Stronger Extraterritorial Labor and Employment Protection*, 33 Hastings Int'l & Comp. L. Rev. 479, 491–92 (2010).  A recent decision of the U.S. District Court for the District of Columbia decided this question only implicitly. *See Hodge v. United Airlines*, --- F. Supp. 2d ---, 2011 WL 5024176, at *16 (D.D.C. Oct. 21, 2011) (treating application of 29 C.F.R. § 825.800 as dispositive and dismissing an FMLA claim where "no reasonable jury could conclude that [plaintiff] was employed in the United States" within the meaning of that regulation).

reflect an attempt to apply the FMLA extraterritorially. This threshold matter arises here because Souryal's worksite prior to her termination was at the Embassy in Baghdad, whereas the employer's allegedly violative actions may well have occurred in the United States. The determination whether Souryal's complaint indeed attempts to apply the FMLA extraterritorially involves a two-step inquiry. At the first step, it is necessary to resolve whether extraterritoriality analysis is triggered by (i) plaintiff's worksite location or (ii) by the locus of the employment actions alleged to be violative of the FMLA. If the answer to this first question is the locus of the employment decision, then the FMLA's extraterritorial effect is not implicated and the analysis ends. But, if it is plaintiff's worksite that triggers whether plaintiff seeks extraterritorial application of the FMLA, then the second step of the inquiry must be addressed. At this step, it is necessary to address whether the Embassy is within the territory of the United States. Only if the Embassy is not within the territory of the United States is the FMLA's extraterritorial effect implicated.

At the first step, Supreme Court precedent, although not squarely apposite, points persuasively, by implication, to the conclusion that an employee's FMLA claims against her employer necessarily involve an attempt to apply the statute extraterritorially when the employee's worksite is outside U.S. territory. In *Foley Brothers v. Filardo*, the Supreme Court held that the eight-hour provision of the Fair Labor Standards Act ("FLSA") was "inapplicable to a contract for the construction of public works in a foreign country[.]" 336 U.S. 281, 290–91 (1949). In reaching this conclusion, the Supreme Court framed its analysis of FLSA's extraterritorial application in terms of whether Congress intended "to make the law applicable to . . . *work performed in foreign countries*." *Id.* at 284–85 (emphasis added). Decades later in *EEOC v. Arabian American Oil Co.* (*Aramco*), the Supreme Court held that Title VII of the Civil

Rights Act of 1964 did not "regulate the employment practices of United States employers who employ United States citizens abroad." 499 U.S. 244, 246–47 (1991). In arriving at that conclusion, the Supreme Court understood that its "task" with respect to its assessment of Title VII's extraterritorial effect was "to determine whether Congress intended the protections of Title VII to apply to United States citizens *employed by American employers outside of the United States*." 499 U.S. at 248 (emphasis added).

Thus, although neither decision squarely addresses the question, it is clear that in both *Foley Brothers* and *Aramco*, the Supreme Court's extraterritoriality analysis was triggered not by the place of the employer's decision, but rather by the claimant's worksite location. The conclusion that the worksite location determines whether a statute's extraterritorial effect is implicated also comports with common sense; no matter where the allegedly unlawful decision is made, it is implemented at the claimant's worksite, and the claimant experiences the decision's effects at that worksite. Nor does it matter that *Foley Brothers* and *Aramco* involved FLSA and Title VII respectively, as there is no reason in principle that the Supreme Court's analysis in those contexts should be any different from the analysis in the FMLA context. In sum, therefore, it is the worksite location that triggers analysis of the FMLA's extraterritorial effect.

Given this, it is necessary to consider whether the Embassy is a U.S. territory. An exact definition of "U.S. territory" is not found in the cases on extraterritorial effect of federal statutes, but it can be generally said that a region constitutes a U.S. territory if the U.S. has jurisdiction to regulate conduct by virtue of the conduct occurring within that region. *See Foley Bros.*, 336 U.S. at 285 (holding that 8-hour provision of FLSA does not apply outside "places over which the United States has sovereignty or has some measure of legislative control"). As the Supreme Court has put it, territorial jurisdiction exists if the region is "a territory of the United States in a

- 7 -

political sense, that is, a part of its national domain." *Vermilya-Brown Co. v. Connell*, 335 U.S.

377, 380–81 (1948). Thus, the touchstone of whether a particular region is a U.S. territory is

presence, extent, and exercise of U.S. sovereignty "in a political sense"[3] over that region. *See*

*Foley Bros.*, 336 U.S. at 286.

From this, it follows that the Embassy is not a U.S. territory. Some courts in other

contexts have reached a similar conclusion. *See United States v. Ayesh*, 762 F. Supp. 2d 832,

837 n.2 (E.D. Va. 2011) ("Indeed, ordinary territorial jurisdiction . . . does not embrace United

States embassies abroad.") (citing *United States v. Passaro*, 577 F.3d 207, 212 (4th Cir. 2009)).

Although the United States may own a fee simple interest in the land on which the Embassy

compound sits, the United States does not exercise political sovereignty over that land. This

conclusion is consistent with the longstanding (and often misunderstood) international-relations

doctrine that the law of the *receiving* country, *i.e.*, the country in which the embassy sits, governs

activities inside the embassy absent some other agreement. *See United States v. Gatlin*, 217 F.3d

207, 214 (2d Cir. 2000) (citing 1 *Oppenheim's International Law* § 558, at 1157 (Robert

Jennings & Arthur Watts eds., 9th ed. 1992) ("The view, formerly widely held, that the

[diplomatic] force was in all respects to be regarded as beyond the jurisdiction of the territorial

state . . . and subject only to that of its own authorities can no longer be maintained.") (footnote

omitted)). The *Restatement* puts the point clearly and directly in the following terms:

> The status of diplomatic premises arises from the rules of law relating to
> immunity from the prescriptive and enforcement jurisdiction of the
> receiving state; the premises *are not a part of the territory of the sending*
> *state*.

*Restatement (Second) of Foreign Relations Law of the United States* § 77 cmt. a (1965)

(emphasis added). Neither the Status of Forces Agreement nor any other provision of law

---

[3] *Vermilya-Brown*, 335 U.S. at 381.

purports to confer U.S. jurisdiction over activities inside U.S. diplomatic missions on Iraqi soil. Thus, it is clear that "United States embassies," including the Embassy in Baghdad, "are not within the territorial jurisdiction of the United States." *McKeel v. Islamic Repub. of Iran*, 722 F.2d 582, 588 (9th Cir. 1983) (holding that U.S. embassy in Iran was not a U.S. territory for purposes of the Foreign Sovereign Immunities Act).[4]

Because Souryal's FMLA claim depends on whether the statute applies extraterritorially, the question of the FMLA's extraterritorial reach is squarely presented here.

## IV.

There is no doubt that Congress has the power to make the FMLA applicable to employees of American contract employees working at U.S. embassies overseas; the question presented here is whether Congress has exercised this power. *See Aramco*, 499 U.S. at 248. The starting point in answering this question must be the statute itself, for "it is a matter of statutory interpretation as to whether or not statutes are effective beyond the limits of national sovereignty." *Vermilya-Brown*, 335 U.S. at 389–90 (noting further that a statute's extraterritorial applicability "depends upon the purpose of the statute"). As it happens, however, the FMLA is completely silent in this question. Given this, the next step in the analysis must be to consult the interpretive canons that furnish the background against which Congress enacts statutes.

Here, the pertinent interpretive canon is the presumption against extraterritoriality, which reflects the "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Aramco*, 499 U.S. at 248 (citation and internal quotation marks omitted). This

---

[4] Almost forty years ago, the Fourth Circuit stated, in *dictum*, that American embassies are "part of the territory of the United States." *United States v. Erdos*, 474 F.2d 157, 159 (4th Cir. 1973) (quoting *United States v. Archer*, 51 F. Supp. 708, 709 (S.D. Cal. 1943)). As other courts have explained, this understanding now appears to be outmoded. *See, e.g.*, *McKeel*, 722 F.2d at 588.

presumption "rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign matters." *Morrison v. Nat'l Australia Bank*, --- U.S. ---, 130 S. Ct. 2869, 2877 (2010) (citing *Smith v. United States*, 507 U.S. 197, 204 n.5 (1993)). Consistent judicial application of the presumption "preserv[es] a stable background against which Congress can legislate with predictable effects." *Morrison*, 130 S. Ct. at 3881. The presumption against extraterritoriality "can be overcome only if there is an 'affirmative intention of the Congress clearly expressed.'" *Reyes-Gaona v. N.C. Growers Assoc.*, 250 F.3d 861, 864 (4th Cir. 2001) (quoting *Aramco*, 499 U.S. at 248). Thus, it is presumed that Congress is "aware[] of the need to make a clear statement that a statute applies overseas" if Congress so wishes. *Aramco*, 499 U.S. at 258. Otherwise, "[w]hen a statute gives no clear indication of an extraterritorial application"––and the FMLA gives no such clear indication—"it has none." *Morrison*, 130 S. Ct. at 2878.

Nor is this a surprising or novel conclusion, given the history of the interplay between Congress and the federal courts with respect to FLSA and Title VII. This history confirms that when statutes are silent on their extraterritorial application, courts will not enforce them extraterritorially. Where Congress intends that a statute apply to worksites abroad, it knows that it must clearly say so. After the Supreme Court concluded in *Vermilya-Brown* that the maximum-hour and minimum-wage requirements of the Fair Labor Standards Act applied to workers on a U.S.-leased military base in Bermuda, Congress responded by amending FLSA to restrict the reach of many of its protections to those working in the United States and several specifically named U.S. territories. *See* Pub. L. No. 85-231, 71 Stat. 514 (1957), *codified as amended at* 29 U.S.C. § 213(f). Decades later, after the Supreme Court held in *Aramco* that Title VII lacked any extraterritorial application, Congress expressly abrogated the case by passing the Civil Rights Act of 1991, which specifically provided for extraterritorial application of Title

VII.[5] Thus, because Congress has not clearly spoken on its extraterritorial application, the FMLA does not apply to employees working outside U.S. territory.

This result obtains notwithstanding a Labor Department regulation providing that "the FMLA applies only to employees who are employed within any . . . possession of the United States." 29 C.F.R. § 825.105(b). Although some authority suggests that a U.S. Embassy might constitute a "possession of the United States" under the FMLA,[6] a regulation extending the FMLA's application beyond U.S. territory would not be entitled to *Chevron* deference. This is so because at the first step of *Chevron* analysis, "[i]f a court, *employing traditional tools of statutory construction*, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect" notwithstanding a contrary agency rule. *Chevron, U.S.A. v. Nat. Res. Def. Council*, 467 U.S. 837, 842 n.9 (1984) (emphasis added).[7] The

---

[5] The Supreme Court in *Aramco* had applied the presumption against extraterritoriality to Title VII and thus concluded that the statute did not apply extraterritorially, notwithstanding the contrary position taken by the federal agency empowered to administer Title VII. Within months of the *Aramco* decision's issuance, Congress enacted the Civil Rights Act of 1991 which, *inter alia*, provided that the term "employee" under Title VII includes "[w]ith respect to employment in a foreign country . . . an individual who is a citizen of the United States." 42 U.S.C. § 2000e(f), *as amended by* Pub. L. No. 102-166, § 109, 105 Stat. 1071.

[6] *See Vermilya-Brown*, 335 U.S. 377 (holding that a U.S.-leased military base in Bermuda constituted a "possession of the United States" for purposes of certain FLSA provisions). It is worth noting, however, that the *Vermilya-Brown* decision prompted Congress to limit FLSA's extraterritorial reach by statutory amendment. Moreover, the Supreme Court in *Vermilya-Brown* acknowledged that the British government had expressly ceded some legislative control over the leased land to the United States. *See id.* at 382 n.4 (noting that the agreement between the United States and Great Britain provided that "[t]he United States shall have all the rights, power and authority within the Leased Areas which are necessary for the establishment, use, operation and defence thereof, or appropriate for their control"). By contrast, no provision of law gives the United States any manner of legislative control over the land on which the Embassy sits.

[7] *See Gen. Dynamic Land Sys. v. Cline*, 540 U.S. 581, 600 (2004) ("Even for an agency able to claim all the authority possible under Chevron, deference to its statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent.").

presumption against extraterritoriality, like other substantive canons, is undoubtedly one such tool. Its application here points persuasively to the conclusion that because Congress legislates against the background of the presumption, Congress has, in fact, "directly spoken to the precise question at issue"[8] by intending, through its silence, that the statute not apply extraterritorially. *Compare Henderson v. INS*, 157 F.3d 106, 129–30 (2d Cir. 1998) (rejecting agency interpretation of federal statute at *Chevron*'s first step in light of the presumption against retroactivity).[9] Accordingly, no regulation could "supply, on Congress's behalf, the clear legislative intent required to overcome," in this case, the presumption against extraterritoriality. *Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 97 n.9 (2d Cir. 2006).

## V.

In sum, because Congress, in the FMLA, has not expressed an intention contrary to the presumption against extraterritoriality, it follows that the statute has no extraterritorial effect and hence Souryal's FMLA claim must be dismissed.[10]

---

[8] *Chevron*, 467 U.S. at 842.

[9] *See also Pharm. Research & Mfgs. of Am. v. Walsh*, 538 U.S. 644, 680 n.4 (2003) (Thomas, J. concurring) ("A court's conclusion that Maine Rx is pre-empted would require rejection of the Secretary's contrary construction of the statute at Chevron's first step, not its second, which asks whether the agency construction is reasonable."); *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 273 (E.D.N.Y. 2007) ("The FDA lacks the authority to supply the legislative intent required to overcome the presumption against preemption in this case, removing it from those agency interpretations that receive deference under *Chevron*.").

[10] Today's holding that the FMLA does not apply extraterritorially in no way suggests that this is a sound policy result. Indeed, by choosing to remain silent on the FMLA's extraterritorial effect, Congress has created an anomaly in that the FMLA's rights apply to State Department employees working at the Embassy, but not to those U.S. citizens who, like Souryal, work alongside those federal employees in similar capacities or under their supervision. In any event, an extension of the FMLA's protections to U.S. citizens working abroad cannot be effected by the executive or judicial branches. Nonetheless, only Congress can eliminate this anomaly by extending the FMLA's reach, as it did with respect to Title VII after the Supreme Court in *Aramco* held that Title VII did not apply extraterritorially.

An appropriate Order has issued.

Alexandria, Virginia
February 6, 2012

T. S. Ellis, III
United States District Judge